**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LINDA COLTER,

      Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

      Defendant.

Civil Action No. 20-0632 (CKK)

**MEMORANDUM OPINION**
(March 10, 2022)

Pending before this Court are Plaintiff's [14] Motion for Judgment of Reversal ("Pl.'s Mot.") and Defendant's [17] Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mot.").  Plaintiff Linda Colter ("Plaintiff" or "Ms. Colter") requests reversal of the Acting Commissioner of the Social Security Administration's ("SSA") decision to deny Plaintiff's application for Title XVI supplemental security income benefits ("Decision").  Plaintiff alleges that the Administrative Law Judge ("ALJ") who issued the Decision erred insofar as he improperly assessed the Plaintiff's Residual Functional Capacity ("RFC") by (1) failing to perform a function-by-function assessment of Plaintiff's work-related abilities; (2) misevaluating pertinent evidence; and (3) failing to give controlling weight to the opinion of Plaintiff's treating physician.  Additionally, Plaintiff argues that the ALJ failed to properly evaluate the Plaintiff's subjective complaints as to. *See* Pl.'s Mot., ECF No. 14-1, at 3–14.

Upon consideration of the pleadings,[1] the relevant legal authority, and the entire record, and for the reasons set forth herein, the Court finds that none of Plaintiff's arguments warrant remand of Defendant's decision.  Accordingly, the Court shall **DENY** Plaintiff's [14] Motion for Judgment of Reversal and **GRANT** Defendant's [17] Motion for Judgment of Affirmance.

## I. BACKGROUND

Plaintiff Linda Colter, who resides in Washington, D.C., was 56 years old when she became disabled on April 1, 2015. (AR 63).  She has a high school diploma, an associate's degree in accounting, and her professional history includes working: (1) for the District of Columbia Child Support Enforcement Division, interviewing customers for child support eligibility; (2) as a cashier at Macy's; (3) as an office associate at Telesec Corestaff; (4) part-time as a telephone interviewer for National Research, LLC; and (5) part-time at H&R Block as a customer service professional. (AR 35–37, 324).

On December 14, 2015, Plaintiff filed an application for supplemental security income under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, alleging disability beginning on April 1, 2015 due to degenerative disc disease, degenerative joint disease, hypertension, radiculopathy, gout, and heel spurs. (AR 63, 101).  The SSA denied Plaintiff's application initially and upon reconsideration. (AR 101, 116).  On December 11, 2018, Plaintiff—

---

[1] The Court's consideration has focused on the following documents:
  • Plaintiff's Motion for Judgment of Reversal ("Pl.'s Mot."), ECF No. 14;
  • Defendant's Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mot."), ECF No. 17;
  • Plaintiff's Opposition to Defendant's Motion for Judgment of Affirmance and Reply to Defendant's Opposition to Plaintiff's Motion for Judgment of Reversal ("Pl.'s Reply"), ECF No. 20; and
  • the Administrative Record ("AR"), ECF No. 10.
In an exercise of its discretion, the Court concludes that oral argument would not assist the Court in the resolution of this case.

who was represented by counsel—appeared for an administrative hearing and testified before an ALJ. (AR 30).  ALJ Richard Furcolo issued his Decision on February 6, 2019, whereby he denied Plaintiff's application and found that Ms. Colter was not sufficiently disabled to qualify for benefits. (AR 23). After the Appeals Council denied Plaintiff's request for review on January 10, 2020, the ALJ's Decision became the final agency decision.  Plaintiff requests judicial review in this Court pursuant to 42 U.S.C. § 405(g).

## A. Evidence Before the ALJ

The evidence before the ALJ consisted primarily of: (1) medical records spanning from 2012 through 2018, including medical records from doctors who treated Plaintiff and reports from state agency physicians; and (2) testimony by Plaintiff and by Heather Mueller, an impartial vocational expert, during the hearing held by the ALJ.

### 1. Plaintiff's Medical Records

The ALJ found as follows.  During the relevant period, Plaintiff received primary care treatment at Providence Hospital where her primary care physician was Dr. Shadi Soufi, M.D., ("Dr. Soufi").[2]  The plaintiff has a history of degenerative disc disease and degenerative joint disease complicated by peripheral neuropathy. (AR 17).  Additionally, the plaintiff suffers from gout. (AR 17).  An EMG study of the right upper extremity in September 2012, prior to the alleged disability onset date, revealed evidence of chronic carpal tunnel syndrome and chronic ulnar neuropathy. (AR 566).  However, the nerve conduction study of plaintiff's right lower extremity was within normal limits. (AR 566).  Lumbar imaging on March 29, 2013 showed moderate protrusions and enlargement in parts of her spine, but otherwise no evidence of serious issues. (AR 573).

---

[2] Throughout his decision, the ALJ incorrectly refers to Dr. Soufi as "Dr. Sunh." The Court will disregard this mistake.

On January 21, 2015, Plaintiff visited her primary care physician, Dr. Soufi, complaining of back pain and spasms and requesting an MRI. (AR 421).  At that time, Plaintiff indicated that she had not had any recent gout attacks. (AR 421).  Dr. Soufi's examination of Plaintiff found that she had full range of motion in her back as well as "no tenderness, swelling, or redness of joints." (AR 421).

Several months later on April 15, 2015, during a follow-up examination with Dr. Soufi, Plaintiff again complained of pain in her lower extremities in addition to numbness, tingling, and spasms. (AR 544).  Dr. Soufi noted that Plaintiff had been referred to a neurology specialist and had started taking pain medication and undergoing physical therapy. (AR 544).  During the examination, Dr. Soufi again noted that Plaintiff displayed full range of motion in her back and presented "no tenderness, swelling or redness of joints." (AR 545).  Dr. Soufi again referred Plaintiff to a neurologist for a second opinion, to physical therapy, and prescribed pain medication as needed. (AR 545).

On April 30, 2015, Plaintiff began physical therapy for lower extremity weakness. (AR 451.)  Upon physical examination, she presented decreased range of motion and reduced strength in her hips, bilaterally. (AR 453).  Her rehab potential was rated as "Good." (AR 452.)  On July 16, 2015, Plaintiff reported to Dr. Soufi that physical therapy had been helpful in decreasing pain and muscle stress in her lower back. (AR 541).  Although she complained of worsening neuropathic pain in her upper and lower extremities, she admitted that she had not been taking her neuropathic medication regularly. (AR 541).

Plaintiff was admitted to the Emergency Department of Providence Hospital on September 4, 2015 with complaints of a rash on her lower legs. (AR 510).  Upon examination, she displayed

normal range of motion, did not feel pain when touched, and had no gross motor weakness or sensory deficits. (AR 511).

On October 30, 2015, Plaintiff returned to the Emergency Department of Providence Hospital, complaining of sharp, intermittent left foot pain and swelling. (AR 480). Although she displayed tenderness in her left heel and minimal swelling, she otherwise exhibited full range of motion and normal strength of the bilateral ankles and toes, and normal, steady gait. (AR 481). An x-ray examination of Plaintiff's left foot revealed minimal heel spur but no obvious acute abnormality. (AR 481).

Plaintiff underwent a consultative examination on October 20, 2016 with Dr. Elizabeth Nolte, M.D. ("Dr. Nolte"). (AR 548).   Upon evaluation, Plaintiff endorsed a history of degenerative disc disease and degenerative joint disease characterized by pain and spasms in her extremities. (AR 548). Plaintiff reported that she while could cook and clean in moderation, she had difficulty opening bottles and chopping food. (AR 548).  She endorsed that she could lift five pounds, sit for thirty minutes, stand for fifteen minutes, and walk one block. (AR 548).  She further indicated to Dr. Nolte that she has difficulty walking down stairs, but does not use a cane. (AR 548).

Her musculoskeletal examination revealed full range of motion throughout the spine and upper and lower extremities. (AR 550).  The examiner found that Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally.   Although she exhibited hard nodules of the DIP joints of her hands, her joints otherwise appeared nontender and stable. (AR 550).  The examiner found no evident concerns such as redness, heat, swelling, or effusion. (AR 550).  Plaintiff demonstrated physiologic and equal deep tendon reflexes, no sensory deficit, and 5/5 muscle strength in her upper and lower extremities. (AR 551).  Although Dr. Nolte

found that Plaintiff had 3/5 grip strength bilaterally, she otherwise exhibited intact hand and finger dexterity and was able to zip, button, and tie. (AR 551).

Although Plaintiff was unable to walk on her heels, she was able to walk on her toes. (AR 549).  She demonstrated otherwise normal physiological gait and stance without the use of an assistive device and could perform two-thirds of a full squat. (AR 549–50).  Dr. Nolte observed that she required no assistance changing for the exam or getting on and off the examination table and was also able to rise from her chair independently. (AR 550).  Based on the examination, Dr. Nolte found that Plaintiff had a mild limitation in walking, squatting, and grasping. (AR 551).  She further recommended that Plaintiff should avoid heavy lifting and carrying due to carpal tunnel. (AR 551).

In October 2018, Plaintiff underwent repeat imaging of the lumbar spine which failed to reveal any significant changes from previous studies. (AR 605–06).

As for the opinion evidence, Plaintiff's treating physician, Dr. Soufi, prepared multiple medical source statements regarding the Plaintiff's residual functional capacity. (AR 507–08, 556–57, 589–96, 599–602).  On March 28, 2016, Dr. Soufi found moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and moderate repeated episodes of decompensation. (AR 508).  Dr. Soufi further found that Plaintiff could sit for at least two hours and stand and walk for less than two hours. (AR 508).  Dr. Soufi also indicated that Plaintiff could lift up to ten pounds frequently. (AR 508).

On January 26, 2017, Dr. Soufi again examined Plaintiff for a Medical Examination Report, finding that Plaintiff displayed moderate restrictions of activities of daily living and moderate difficulties in maintaining social functioning. (AR 557).  Dr. Soufi further indicated that

6

Plaintiff exhibited extreme limitations in maintaining concentration, persistence, or pace and extreme limitations in repeated episodes of decompensation of extended duration in a work setting. (AR 557). He also found that Plaintiff could sit, stand, and/or walk for less than two hours and could frequently lift up to ten pounds. (AR 557).

Further, on May 29, 2017, Dr. Soufi completed a Residual Functional Capacity Questionnaire regarding Plaintiff's physical health. (AR 589–96). In that report, Dr. Soufi limited the claimant to a less than sedentary profile, finding that she could never stand and/or walk in an eight-hour workday, even with normal breaks. (AR 591). He indicated that she could sit for thirty minutes and stand and/or walk for ten minutes before needing to alternate positions. (AR 591). He noted that she could lift only up to ten pounds and could never carry any weight. (AR 592). He found that Plaintiff had bilateral limitations in simple grasping, pushing and pulling, and fine manipulation. (AR 593). Dr. Soufi indicated that she could occasionally bend, climb stairs, reach above, stoop, crouch, and kneel, but could never squat, crawl, or climb ladders. (AR 593–94). He further noted that she could not tolerate any exposure to unprotected heights and moving machinery, and could not drive automotive equipment. (AR 594). He found that she could frequently tolerate exposure to dust, fumes, gases, and noise and occasionally tolerate extreme cold and heat, wetness, and humidity. (AR 594).

Additionally, Dr. Soufi adopted similar findings on a medical assessment performed on October 10, 2017. (AR 601–02). However, Dr. Soufi found only moderate restrictions in Plaintiff's activities of daily life. (AR 602). Moreover, Dr. Soufi examined Plaintiff again on August 8, 2018 and limited her to a less than sedentary profile, this time finding extreme restrictions in activities of daily living, but moderate restrictions in every other domain. (AR 600).

Plaintiff's functional capacity was also evaluated by two non-examining state agency experts.  At the initial level, Dr. Walter Y. K. Goo ("Dr. Goo") evaluated the relevant medical evidence and limited Plaintiff to light work, finding that Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. (AR 69–70).  Dr. Goo noted that she could stand, sit, and/or walk for six hours in an eight-hour workday and she could frequently lift and carry ten pounds. (AR 69).  He further explained that she could frequently handle and finger with her right hand. (AR 70).  At the reconsideration level, Dr. Esther Pinder ("Dr. Pinder") independently evaluated the record evidence and adopted the same findings assessed by Dr. Goo at the initial level. (AR 79–82, 92–95).

## 2. Testimony at the Administrative Hearing

At the administrative hearing, Plaintiff testified that she applied for disability benefits after being diagnosed with degenerative disc disease, degenerative joint disease, carpal tunnel syndrome, and neuropathy. (AR 40).  Plaintiff reported that she started experiencing health problems in 2012 while attending school but waited until 2015 to apply for disability benefits because she "wanted to graduate and go back to work." (AR 49–50).  She testified that she has constant and consistent pain every day. (AR 43).  She explained that she suffers from muscle spasms in her legs, back pain due to bulging discs, and arthritis in her hands. (AR 43).  She testified that several weeks prior to the hearing her arthritis made her unable to move her right hand. (AR 43).  Plaintiff frequently takes pain medications which cause her to go to sleep. (AR 43).  She explained that her medication would cause her to have frequent absences from work. (AR 45).  After she takes Flexeril and Tramadol at night, she is unable to get up the next day. (AR 45).  She testified that she has difficulty concentrating because of her medication. (AR 46).

She testified that she is unable to put on her shoes sometimes. (AR 44). Plaintiff explained that she could not sit for more than an hour or two before she has to change positions because she begins to have muscle aches. (AR 44, 48).  Plaintiff testified that she would have to stop and rest after walking about one or two blocks. (AR 44).  She testified that she could pick up a five-pound bag of potatoes or a gallon of milk and that she could stand for about an hour. (AR 55).  She testified that she has to lie down after activities such as cooking meals or baking and that her feet swell with prolonged standing and walking. (AR 44). She further testified that she underwent both occupational and physical therapy twice, with little to no improvement. (AR 47).  Plaintiff testified that she lives with her older brother, but that she does not currently provide care for him. (AR 51–52). She testified that she is able to perform light household chores such as cooking, baking, dusting, sweeping, laundry duties, vacuuming, and personal grocery shopping. (AR 55–56).

### B. The ALJ's Decision

On February 9, 2019, the ALJ issued a decision finding that Plaintiff was not entitled to disability benefits as she was not sufficiently disabled. (AR 23).  An individual must have a "disability" to qualify for disability benefits under the Social Security Act (the "Act"). *See* 42 U.S.C. § 423(a).  To do so, the ALJ relied upon the following principles of law.  Under the Act, a "disability" is defined as a condition that renders the applicant unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant must

support her claim of impairment with "[o]bjective medical evidence" that is "established by medically acceptable clinical or laboratory diagnostic techniques." 42 U.S.C. § 423(d)(5)(A).

The SSA has established a five-step sequential analysis for determining whether a claimant is disabled and entitled to disability benefits. *See* 20 C.F.R. § 404.1520. At step one, the claimant must show that she is not presently engaged in substantial gainful employment. *Id.* § 416.920(a)(4). If the answer is yes, the ALJ will find that the claimant is not disabled. *Id.* § 416.920(a)(4)(i). If the answer is no, the ALJ moves to step two, where the claimant must show that she has a "severe medically determinable physical or mental impairment" or a combination of severe impairments that meets certain duration requirements under the regulations. *Id.* § 416.920(a)(4)(ii). If the claimant has such impairment or impairments, the analysis will move to step three, where the claimant must show that her impairment meets or equals an impairment listed in the Listing of Impairments, *Id.* § 404, Subpart P, Appendix 1 ("Listing of Impairments"). *Id.* § 416.920(a)(4)(iii). If her impairment is listed, then she is conclusively presumed disabled and the inquiry ends here. *Id.* § 416.920(d).

If the impairment is not listed, the ALJ continues to step four to assess the claimant's residual functional capacity ("RFC") and "past relevant work." *Id.* § 416.920(a)(4)(iv). In determining a claimant's RFC, the ALJ must consider the tasks that can be performed by a claimant despite any physical or mental limitations, and the ALJ will evaluate medical, physical and mental factors; the claimant's descriptions of impairments and limitations; relevant medical evidence; and other relevant evidence. *Id.* § 404.1545. The claimant must show that her impairment prevents her from performing her "past relevant work." *Id.* § 416.920(a)(4)(iv). If the claimant remains capable of doing past relevant work, the ALJ will find the claimant is not disabled. *Id.* If the ALJ determines that the claimant is not capable of doing her past relevant work, the ALJ's analysis

moves to step five, the final step, to assess whether there is other work that the claimant could do, considering the claimant's "residual functional capacity . . . age, education, and work experience." *Id.* § 416.920(a)(4)(v). If the ALJ determines that the claimant is not capable of adjusting to other work, the ALJ will find that the claimant is disabled. *Id.*

The claimant bears the burden of proving the first four steps, and then the burden shifts to the Commissioner at step five to produce evidence of jobs that the claimant can perform. *See Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004); *see also Smith v. Astrue*, 935 F. Supp. 2d 153, 158 (D.D.C. 2013) (CKK). The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's vocational factors and RFC. If the claim survives these five steps, then the claimant is deemed disabled and qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4).

In the instant case, the ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since December 14, 2015, the application date. (AR 17). At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease, peripheral neuropathy, and major joint dysfunction." (AR 17).

At step three, the ALJ evaluated the Plaintiff's physical impairments and determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 17–18). Regarding Plaintiff's back condition, the ALJ noted that nothing in the record demonstrated "compromise of a nerve root or the spinal cord with evidence of nerve root compression, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss . . . spinal arachnoiditis, or lumbar spinal stenosis resulting in inability to ambulate effectively." (AR 17–18).

With regard to Plaintiff's major joint dysfunction, the ALJ noted that Plaintiff's medical records "do not indicate that she suffers from an inability to use the bilateral upper extremities to perform gross and fine manipulation," nor do they indicate that "she suffer[s] from an inability to ambulate effectively as [sic] result of joint dysfunction." (AR 18).

Finally, regarding Plaintiff's peripheral neuropathy, the ALJ found that while Plaintiff exhibited "some manifestations of neuropathic symptoms," her symptoms do not cause a "'marked' limitation in physical functioning," as "she does not exhibit disorganization of the motor functions in two extremities," causing her to experience extreme limitations in her ability to either stand up, balance, or use her upper extremities. (AR 18).

Accordingly, the ALJ moved to step four, where he found that Plaintiff had the "residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can operate a right hand control on a frequent basis." (AR 18).  The ALJ also found that Plaintiff "can handle or finger with the right hand on a frequent basis," and "can occasionally climb ladders, stoop, kneel, crouch, or crawl." (AR 18).

At this step, the ALJ indicated that he considered Plaintiff's symptoms, the "extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and opinion evidence, as required pursuant to the SSA regulations. (AR 18).  In his analysis, the ALJ determined that while "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision." (AR 19).

The ALJ considered and weighed the following information: (1) the Plaintiff's treatment history; (2) the objective clinical findings; (3) Plaintiff's subjective complaints during her testimony at the administrative hearing; and (4) all of the medical opinions and record evidence. (AR 22).  The ALJ found that Plaintiff had the residual functional capacity to perform light work with certain limitations. (AR 22).

Furthermore, the ALJ assigned the following weights to medical provider opinion evidence: (1) limited persuasive weight to the opinions of Plaintiff's treating physician, Dr. Soufi; (2) great persuasive weight to the assessment of consultative examiner, Dr. Nolte; (3) great persuasive weight to the assessment of state agency non-examining expert Dr. Goo; and (4) great persuasive weight to the reconsideration assessment of state agency non-examining expert Dr. Pinder. (AR 21–22).

At step five, the ALJ found that Plaintiff was capable of performing her past relevant work as a child support officer. (AR 23).  The ALJ accepted the testimony of the vocational expert, Heather Mueller, who found that Plaintiff was able to perform her past relevant work as a child support officer, both as actually and generally performed. (AR 23).  The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, since December 14, 2015, the date Plaintiff filed her application for benefits. (AR 23).

## II. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g), permits a plaintiff to seek judicial review, in a federal district court, of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party." 42 U.S.C. § 405(g); *see also Contreras v. Comm'r of Social Security*, 239 F. Supp. 3d 203, 206 (D.D.C. 2017).  This Court must uphold the Commissioner's determination "if it is supported by substantial evidence and is not tainted by an error of law."

*Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987); *see also* 42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).  The substantial evidence test requires "more than a scintilla, but . . . something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  A court may not re-weigh the evidence or supplant the SSA's judgment of the weight of the evidence with its own. *Cunningham v. Colvin*, 46 F. Supp. 3d 26, 32 (D.D.C. 2014) (quotation omitted).

Instead, a court must scrutinize the entire record and give "considerable deference to the decision rendered by the ALJ and the Appeals Council." *Crawford v. Barnhart*, 556 F. Supp. 2d 49, 52 (D.D.C. 2008).  Notwithstanding the deferential nature of the standard, courts must give the record "careful scrutiny" to "determine whether the Secretary, acting through the ALJ, has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits." *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (citations and internal quotation marks omitted).  An ALJ may not "merely disregard evidence which does not support his conclusion." *Martin v. Apfel*, 118 F. Supp. 2d 9, 13 (D.D.C. 2000) (citation omitted).  "A reviewing court should not be left guessing as to how the ALJ evaluated probative evidence." *Id.* (citations omitted).  Moreover, it is "reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence." *Id.* (citations omitted); *accord Simms*, 877 F.2d at 1050.

### III. DISCUSSION

Plaintiff contends that the ALJ erroneously assessed her Residual Functional Capacity by: (1) failing to properly perform a function-by-function assessment of Plaintiff's work-related abilities; (2) failing to properly evaluate pertinent evidence; and (3) failing to give controlling weight to the opinion of Plaintiff's treating physician. Additionally, Plaintiff argues that (4) the ALJ failed to properly evaluate the Plaintiff's subjective complaints. *See generally* Pl.'s Mot. at 3–11. Each of these arguments will be addressed in turn.

### A. The ALJ Properly Performed a Function-By-Function Analysis

Plaintiff first argues that the ALJ erred at step four during the Residual Functional Capacity analysis by failing to perform a function-by-function analysis of Plaintiff's abilities "to perform the physical and mental demands of work." *Id.* at 5. Specifically, Plaintiff argues that the ALJ failed to follow or cite to the procedures found in Social Security Ruling 96-8p governing an RFC assessment. *Id.* at 7; SSR 96-8p, 1996 WL 374184 (July 2, 1996). SSR 96-8p provides, in part, that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . [before the] RFC [may] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.* at *1. Plaintiff asserts that the ALJ improperly concluded that she was capable of performing light work without assessing her functional abilities "to sit, stand, or walk." Pl.'s Mot. at 7. Plaintiff is incorrect.

Plaintiff relies heavily on a recent Fourth Circuit case, *Dowling v. Commissioner of Social Security Administration*, to support her argument that the ALJ erred in his RFC analysis. *Id.* at 5–7 (quoting *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 387–88 (2021). Such opinion

is not binding upon this Court and so shall be considered persuasive to the extent that the analysis contained therein warrants this Court's approval and does not conflict with the law of this Circuit.

Plaintiff, citing *Dowling*, argues that it was error for the ALJ to fail to cite to either 20 C.F.R. § 416.945 or SSR 96-8p. *See* Pl.'s Mot. at 7. The Court need not now determine if such a failure to cite to the framework governing the RFC analysis be error as the ALJ in the instant case *did* cite to both provisions. *See* AR 16 ("In making this finding, the undersigned must consider all of the claimant's impairment's, including impairments that are not severe (*20 CFR 416.920(e) and 416.945; SSR 96-8p*)) (emphasis added).

Next, Plaintiff cites to *Dowling* in support of her argument that the ALJ failed to perform a function-by-function analysis. Pl.'s Mot. at 5–7. Insofar as Plaintiff, or *Dowling*, suggests that an ALJ is required to address, in writing, every work-related function listed in either 20 C.F.R. § 416.945 or SSR 96-8p, that position has consistently been rejected in this Circuit so long as the ALJ provides a thorough narrative discussion explaining how the record evidence supports his conclusions. *See, e.g.*, *Kim M. v. Kijakazi*, No. 20-CV-2072, 2021 WL 4033060, at *7 (D.D.C. Sept. 3, 2021) (collecting cases). "Although the language of SSR 96–8p requires that the ALJ's RFC assessment 'must address . . . the remaining exertional . . . capacities of the individual,' this does not require written articulation of all seven strength demands. This is especially true where, as here, the ALJ provided a thorough narrative discussion of [Plaintiff's] limitations." *Banks v. Astrue*, 537 F. Supp. 2d 75, 85 (D.D.C. 2008).[3]

---

[3] *Accord Nsiah v. Saul,* No. 19-cv-00042, 2021 WL 372784, at *14 (D.D.C. Feb. 3, 2021) ("[A] narrative discussion 'is sufficient for the ALJ to fulfill [his] obligation to complete a function-by-function analysis that allows the [court] to conduct meaningful review.'") (quoting *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017)); *Contreras*, 239 F. Supp. 3d at 207 (D.D.C. 2017) ("This court has found that when 'the ALJ provided a thorough narrative discussion of [Plaintiff's] limitations,' and has built a 'logical bridge' from the evidence to his conclusion, the RFC analysis does not require 'written articulation of all seven strength demands.'") (quoting

The ALJ provided a sufficiently thorough narrative discussion here that addressed the relevant pieces of evidence and explained how the evidence supported his conclusions regarding Plaintiff's limitations.  For example, the ALJ explained that his determination as to Plaintiff's functional capacity to walk was based on the clinical findings of Dr. Nolte and evidence from Plaintiff's treatment records. (AR 20, 22).  Moreover, throughout the Decision, the ALJ discusses, to varying degrees, Plaintiff's abilities to walk, sit, stand, squat, grasp, lift, carry, climb ladders, stoop, kneel, crouch, and crawl. (AR 20–21).  Thus, the Court finds the ALJ committed no error here.

Furthermore, Plaintiff is incorrect in arguing that the ALJ "simply concluded that the Plaintiff was capable of performing 'light work'" without analysis. *See* Pl.'s Mot. at 5.  Unlike in *Dowling* where the ALJ "barely mentioned" and "never specifically discussed" the extent to which the claimant's alleged sitting problems impacted her functional restrictions, here the ALJ substantially explained the evidence in the record as well as how his conclusions followed from that evidence. The ALJ specifically discussed the main medical problems faced by Plaintiff and their effect on her functional capacity. (AR 20) ("Despite having some degeneration of the spine and joints, [Plaintiff] retains full strength, intact sensation, and normal physiological gait without the use of an assistive device. . . . While [Plaintiff] has a history of right ulnar neuropathy, treatment records generally indicate that she did not exhibit any motor weakness or gait/coordination disturbance.").  The ALJ did not, as Plaintiff suggests, merely conclude that she was capable of performing "light work" without proper analysis.  As discussed earlier, the ALJ included a lengthy

---

*Banks*, 537 F. Supp. 2d at 85). *But see Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 68 (D.D.C. 2006) (finding error in ALJ's failure to explicitly discuss all seven strength factors).

narrative discussion describing Plaintiff's medical records, opinion evidence, and testimony at the hearing and explaining how he reached his conclusions from that evidence. (AR 20–21).

In his Decision, the ALJ limited the Plaintiff to "light exertional work" only after thoroughly explaining his basis for doing so.[4] The ALJ noted that "the full longitudinal record fails to support the presence of greater physical limitations than those found" by consultative examiner, Dr. Elizabeth Nolte, for several reasons, including evidence suggesting full hand and finger dexterity, no "motor weakness or gait/coordination disturbance," a mild grasping limitation, daily "activities that are not as limited as one would expect given [Plaintiff's] allegations," and evidence that Plaintiff responded well to conservative treatment. (AR 20–21). The ALJ's thorough and detailed analysis of Plaintiff's alleged limitations and symptoms are more than sufficient to allow for meaningful judicial review and to satisfy the requirements of substantial evidence.

**B.      The ALJ Did Not Fail to Evaluate Pertinent Evidence**

Plaintiff next argues that the ALJ's RFC analysis was flawed because the ALJ failed to properly evaluate pertinent evidence regarding Plaintiff's bilateral upper extremity limitations. *See* Pl.'s Mot. at 7. In his RFC assessment, the ALJ found that Plaintiff had the capacity to handle or finger with her right hand on a frequent basis and to "operate a right hand control on a frequent basis." (AR 20). Plaintiff points to three different pieces of evidence that she claims the ALJ either ignored or failed to evaluate properly: a 2012 EMG evaluation of Plaintiff's right upper extremity; a 2016 report from consultative examiner Dr. Elizabeth Nolte finding Plaintiff had 3/5 grip strength, bilaterally; and a 2019 EMG evaluation diagnosing Plaintiff with bilateral cervical

---

[4] That the ALJ expressed Plaintiff's RFC at the beginning in his point heading regarding step four of his analysis does not indicate that the ALJ started with a particular conclusion in mind and worked backward to provide justification for said conclusion. If that were the case, every legal opinion that contains a substantive point heading would be deemed suspect. The Court disagrees with such a conclusion and finds no error in this regard with the ALJ's opinion.

polyradiculopathy, bilateral lumbosacral polyradiculopathy, bilateral carpal tunnel syndrome, and peripheral polyneuropathy. Pl.'s Mot. at 7.  Looking at the record as a whole and upon the ALJ's opinion and reasoning, the Court finds that the ALJ did not err and had substantial evidence for his RFC findings regarding Plaintiff's upper extremity limitations.

Contrary to Plaintiff's assertion, the ALJ did in fact cite to and discuss both the 2012 EMG findings and Dr. Nolte's findings regarding Plaintiff's bilateral 3/5 grip strength. (AR 19) ("[A]n EMG study of the right upper extremity from September 2017[5] that revealed evidence of chronic carpal tunnel syndrome and chronic ulnar neuropathy."); (AR 20) ("Although [Plaintiff] demonstrated 3/5 grip strength bilaterally . . . .").  The ALJ also cited to and relied upon Dr. Nolte's findings that Plaintiff had 5/5 strength in both her upper and lower extremities. (AR 20, 22). Plaintiff, it appears, confuses the distinction between Dr. Nolte's findings regarding upper extremity strength and grip strength. Further, as noted by the ALJ, Dr. Nolte found that Plaintiff exhibited intact hand and finger dexterity and was "[a]ble to zip, button, and tie." (AR 20). Moreover, the ALJ did not merely cite to Dr. Nolte's findings, but explained those findings and how they factored into his ultimate analysis and conclusions.  (AR 20).

Next, the ALJ discussed in some detail the findings from Plaintiff's 2012 EMG evaluation that indicated evidence of chronic carpal tunnel syndrome and chronic ulnar neuropathy. (AR 19–20). That the ALJ did not make the conclusions from this evidence that Plaintiff argues he should have is not itself a showing of error, particularly where the ALJ explained the basis for the weight he gave to those findings. *See Smith v. Astrue*, 534 F. Supp. 2d 121, 132 (D.D.C. 2008) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the

---

[5] Although the ALJ mistakenly described the EMG as having been conducted in 2017 rather than in 2012, he cited to the correct results in the administrative record from 2012. (AR 19).  Moreover, the ALJ described these EMG findings as having taken place "[p]rior to the alleged onset date," indicating that he was aware of the correct date. (AR 19).  Thus, the mistake appears to have been inadvertent and did not affect the ALJ's findings in any way.

responsibility for that decision falls on the [Commissioner] or the [Commissioner's] designate, the ALJ." (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987))).  The ALJ explained that "[w]hile [Plaintiff] has a history of right ulnar neuropathy, treatment records generally indicate that she did not exhibit any motor weakness or gait/coordination problems." (AR 20). Because the ALJ considered the full record evidence and provided reasons as to his consideration of the evidence, the Court finds no error here.

Regarding Plaintiff's 2019 EMG evaluation, the Court finds no error in the ALJ's lack of discussion of those results. To hold otherwise would be to require the impossible from the ALJ— the EMG results were not submitted until *after* the ALJ had issued his decision. (AR 390) (noting that examination was performed on March 20, 2019).  Plaintiff provides no argument as to how the ALJ could have considered evidence that was not before him as it did not yet exist. As the Commissioner, but not the Plaintiff, points out, this Court may remand a case back to the Commissioner "upon a showing that there is new evidence which is material" and a finding "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *See* Def.'s Mot. at 19; *see also* 42 U.S.C. § 405(g).

The Court finds no cause to remand this case. The ALJ already considered evidence regarding Plaintiff's bilateral upper extremity limitations and took it into account in his analysis. (AR 20).  Plaintiff provides no rationale as to why further diagnostic evidence regarding the existence of bilateral limitations would have "changed the outcome of the prior proceeding." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (explaining the requirements that new evidence must be "material" to warrant a remand).  "After all, 'the outcome of the case depends on the demonstration of the functional limitations of the disease or impairment rather than the mere diagnosis of the disease or name of the impairment.'" *Davis v. Berryhill*, 272 F. Supp. 3d 154, 177

(D.D.C. 2017) (quoting *McKean v. Colvin*, 150 F. Supp. 3d 406, 417 (M.D. Pa. 2015)).  Thus, the Court finds no error in the ALJ's lack of citation to the 2019 EMG results nor cause to remand the case.

### C.     The Weight Given to the Opinion of Plaintiff's Treating Physician is Sufficiently Explained

Plaintiff argues that the ALJ improperly gave limited weight to the medical opinions of her treating physician, Dr. Soufi.  Pl.'s Mot. at 7–11.  Pursuant to the "treating physician rule," which applies to Social Security disability benefits cases, "when a claimant's treating physician[] ha[s] great familiarity with [her] condition, [his] reports must be accorded substantial weight, [and] such an opinion by a treating physician is binding on the factfinder unless contradicted by substantial evidence." *Holland v. Berryhill*, 273 F. Supp. 3d 55, 63 (D.D.C. 2017) (citing *Butler*, 353 F.3d at 1003) (quotation and internal quotation marks omitted)).  A treating physician's medical opinion is entitled to "controlling weight" if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see also Butler*, 353 F.3d at 1003 ("A treating physician's [opinion] is binding on the fact-finder unless contradicted by substantial evidence.").  Generally, the ALJ will also give more weight to a physician if the physician has had a longer treatment relationship with the plaintiff, a higher frequency of examination of the plaintiff, or a specialty in a relevant medical area. *See* 20 C.F.R. § 404.1527(c).

The ALJ "need not treat [treating physicians' opinions] as controlling if they are contradicted by substantial evidence and the ALJ explains why she is not following them." *Callaway v. Berryhill*, 292 F. Supp. 3d 289, 294-295 (D.D.C. 2018) (holding that the ALJ had substantial evidence to support a decision to afford the treating physicians' opinion some weight, but not controlling, because the physicians' testimonies were divergent as to the stress levels of

the claimant and their findings conflicted with other medical evidence); *see also* SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996) ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.").

Thus, where an ALJ does not afford a treating physician's testimony controlling weight, the ALJ must "apply a series of factors to determine what weight should be granted to those opinions." *Porter v. Colvin*, 951 F. Supp. 2d 125, 132 (D.D.C. 2013).  These factors are "(1) examination relationship; (2) treatment relationship; (3) length and nature of treatment; (4) supportability of treating physician's opinion by medical sources; (5) consistency of the opinion with the record as a whole; (6) whether the opinion was rendered by a specialist; and (7) other evidence brought to the attention of the ALJ." *Id.*  The ALJ need not reference each of these six factors; instead, the ALJ only needs to provide "good reasons" for according less than substantial weight to the treating physician's findings. *Turner v. Astrue*, 710 F. Supp. 2d 95, 106 (D.D.C. 2010) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927 (d)(2)).

If an ALJ "rejects the opinion of a treating physician, [he shall] explain his reasons for doing so." *Butler*, 353 F.3d at 1003 (citation omitted).  The ALJ's reasons must be "sufficiently specific to make clear to [the court]" why the ALJ assigned a particular weight to an opinion. SSR 96-2, 1996 WL 374188 at *5; *see also, e.g.*, *Butler*, 353 F.3d at 1003 (emphasizing that the ALJ must explain the weight attached to the treating physician's conclusions and his reasons for doing so); *Perkins v. Berryhill*, 379 F. Supp. 3d 1, 5–6 (D.D.C. 2019) (discussing the ALJ's failure to explain sufficiently his reasoning for declining to accord the treating physician's opinion controlling weight).

While the ALJ need not encompass the entirety of his analysis in any particular paragraph of his decision, he must provide a sufficient basis for this Court to understand his reasoning when viewing the decision as a whole. *See Callaway*, 292 F. Supp. 3d at 296 (where "sufficient information [was] provided for the Court to understand [the ALJ's] reasoning"). To sufficiently demonstrate to the reviewing court the basis for the ALJ's decision to discount a treating physician's opinion, the ALJ needs to "buil[d] a logical bridge from the evidence to [his] conclusion by thoroughly evaluating the evidence, explaining which evidence was persuasive and supported by the record, and comparing the objective medical evidence to Plaintiff's subjective testimony." *Cunningham*, 46 F. Supp. 3d at 36 (internal quotation marks and quotation omitted).

In the instant case, the ALJ assigned "limited persuasive weight" to the opinion evidence of Plaintiff's treating physician, Dr. Soufi. (AR 21). Plaintiff raises several arguments as to why such an assignment of "limited persuasive weight" impermissibly discounts the medical opinions of her treating physician. *See* Pl.'s Mot. at 7–10.

At the outset, Plaintiff argues that the ALJ failed to properly explain what the ALJ meant by the term "limited persuasive weight." *Id.* at 9. The Court disagrees. The plain meaning of "limited persuasive weight" implies that the ALJ gave some—but not full—weight to the opinions of Dr. Soufi. That is exactly what the ALJ did here. The ALJ adopted the opinions of Dr. Soufi as to Plaintiff's capacity to occasionally stoop, kneel, and crouch while diverging with Dr. Soufi's opinions regarding Plaintiff's other capabilities. (AR 20–21). Given the plain and ordinary meaning of the language as well as the surrounding context and application, it is clear what the ALJ meant.

Plaintiff's remaining arguments all concern whether the ALJ properly considered the relevant evidence and sufficiently explained his reasoning for assigning limited weight to Dr.

Soufi's opinions.  First, Plaintiff takes issue with the ALJ's discounting of Dr. Soufi's opinions for being "not fully consistent with the lack of psychiatric symptoms and treatment throughout the record." *See* Pl.'s Mot. at 9; (AR 21).  Plaintiff argues that "there is no indication that Dr. Soufi's opinions were based upon psychiatric symptoms," and, thus, the ALJ was incorrect to discount the opinions for being inconsistent with the record. Pl.'s Mot. at 9. Relatedly, Plaintiff argues that the ALJ "failed to adequately address the Plaintiff's limitations in concentration, persistence, or pace." *Id.* at 10.  Plaintiff is incorrect.

Contrary to Plaintiff's argument, some of Dr. Soufi's opinions were indeed psychiatric in nature, including the opinions regarding her limitations in "concentration, persistence, or pace," that Plaintiff argues the ALJ failed to address. *Id.* On several occasions, Dr. Soufi opined on the Plaintiff's "[d]ifficulties in maintaining [c]oncentration, [p]ersistence, and/or [p]ace," as well as Plaintiff's "[r]epeated episodes of decompensation in work or work like setting, each of an extended duration." *E.g.*, (AR 557).  As the Commissioner points out, both of these opinions reflect the criteria for the evaluation of a mental disability, not of a physical disability. *See* Def.'s Mot. at 22 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C) (pre-January 17, 2017); Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (effective January 17, 2017)).[6]

The ALJ, examining the entire record including Plaintiff's medical records, found no other evidence of such psychiatric symptoms or of any treatment for such symptoms.  Indeed, the Plaintiff never once complained of a mental disability nor did she seek out a determination of mental disability status. (AR 63, 75, 87, 210).  Thus, the ALJ had good reason for discounting this portion of Dr. Soufi's opinions as the opinions were neither substantiated by record evidence nor

---

[6] Defendant's argument on this point is further evidenced by the lack of any reference either to "difficulties in maintaining concentration, persistence, or pace" or to "episodes of decompensation" in the Residual Functional Capacity Questionnaire for *physical* disabilities completed by Dr. Soufi. (AR 589–96).

relevant to the ALJ's determination of Plaintiff's alleged physical disability.  Moreover, the ALJ sufficiently explained his reasoning by providing a logical bridge from the record evidence to his conclusion.

Plaintiff next argues that the ALJ's assignment of limited weight to Dr. Soufi's opinions on account of their being inconsistent with the medical evidence was in error because the ALJ "failed to noted [sic] the multiple MRI examinations and EMG examinations which supported the Plaintiff's complaints, as well as the State Agency physicians' determination that the Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were substantiated by objective medical evidence alone." Pl.'s Mot. at 9–10. As discussed above, the ALJ, contrary to Plaintiff's allegation, did discuss both the MRI and EMG examinations in his opinion. (AR 19–20).  Indeed, the ALJ explained that his limitation analysis was in part based on Plaintiff's 2018 lumbar spine MRI results "fail[ing] to reveal any significant changes from previous studies." (AR 20).  Substantial evidence exists to support the ALJ's conclusions.

Regarding the ALJ's alleged failure to take note of the opinions of the State Agency physicians, the Court finds no basis for Plaintiff's claims. The ALJ gave "great persuasive weight" to the opinions of Dr. Goo, the state physician at the initial level, and Dr. Pinder, the state physician at the reconsideration level, finding them to be consistent with the record evidence. (AR 22). Moreover, it is unclear to the Court how the opinions of Dr. Goo and Dr. Pinder actually support Dr. Soufi's opinions. Indeed, Dr. Goo and Dr. Pinder both found that Plaintiff was capable of performing light work and was only moderately limited in her functional capacities. (AR 67–72, 93–97).  While Plaintiff is correct that Dr. Goo and Dr. Pinder did find that the objective medical evidence supports Plaintiff's claims regarding the limiting effects of her symptoms, their ultimate conclusion was that Plaintiff was not disabled and could perform her past relevant work. (AR 68,

72, 93, 96).  The ALJ's reliance on Dr. Goo and Dr. Pinder, therefore, is not at odds with his discounting of Dr. Soufi's opinions, given the sharp contrast between the respective doctors' opinions.  The Court finds that the ALJ adequately explained his reliance on the opinion evidence of the non-examining experts and did not err.

Plaintiff further argues that the ALJ "failed to identify either the substantial evidence in the record which contradicts Dr. Soufi's opinions, or the opinions of Dr. Soufi [sic] opinions which are actually contradicted by the evidence." Pl.'s Mot. at 10. Although an ALJ is not required to afford controlling weight to a treating physician's opinions, if the ALJ does not treat them as controlling, the ALJ must explain how the treating physician's opinions are contradicted by substantial evidence and why they are not following them. *Butler*, 353 F.3d at 1003.  That is exactly what the ALJ did here.

The ALJ provided several reasons as to why he chose not to give controlling weight to Dr. Soufi's opinions.  First, as discussed above, the ALJ found that Dr. Soufi's opinions regarding Plaintiff's psychiatric symptoms were not supported by record evidence. (AR 21). Second, the ALJ explained that the evidence regarding Plaintiff's daily activities was inconsistent with Dr. Soufi's opinions. (AR 21).  Third, the ALJ found that the limitations expressed in Dr. Soufi's opinions were inconsistent with the record evidence suggesting that Plaintiff responded "relatively well to conservative treatment," and retained "full strength, intact sensation, and normal physiological gait without the use of an assistive device." (AR 21).

Finally, the ALJ explained that Dr. Soufi failed to support his opinions regarding Plaintiff's alleged upper extremity limitations with "objective clinical findings" and failed to "clearly explain the degree of limitation alleged." (AR 21).  For example, regarding whether Plaintiff experienced limitations with repetitive hand movements such as grasping, pulling, pushing, and fine

manipulation, Dr. Soufi answered only "Yes" with no further evidence or explanation. (AR 593). As the ALJ pointed out, other evidence in the record, including the opinions of Dr. Nolte and Dr. Goo, either contradict or fail to support Dr. Soufi's opinions. (AR 21).  The ALJ did not err in finding that Dr. Soufi's opinion in this regard did not accord with the other record evidence regarding Plaintiff's upper extremity limitations.

Accordingly, because the ALJ provided "a logical bridge" from the record evidence to the limited weight he gave to the opinions of Plaintiff's treating physician, the Court finds that the ALJ did not err in discounting the opinions of Plaintiff's treating physician.

**D.    The ALJ's Assessment of Plaintiff's Testimony was Supported by Substantial Evidence**

Plaintiff alleges that the ALJ's finding that "[Plaintiff's] reports of debilitating symptoms and limitations" were undermined by "the fact that the [Plaintiff] described activities that are not as limited as one would expect given her allegations," was not supported by substantial evidence. Pl.'s Mot. at 11–14.  Defendant asserts that "[t]he weighing of Plaintiff's testimony is solely the province of the ALJ, and is due great deference on review." Def.'s Mot. at 26; *see also Grant v. Astrue*, 857 F. Supp. 2d 146, 156–57 (D.D.C. 2012) (noting that the ALJ's assessment of credibility is entitled to "great weight and deference, since he had the opportunity to observe the witness's demeanor").

There is a two-step process to determine "whether a claimant's symptoms affect her ability to perform basic work activities." *Callaway*, 292 F. Supp. 3d at 297 (citing 20 C.F.R. § 404.1529). The first step requires that the ALJ determine whether the claimant's medically determinable impairments could reasonably be expected to produce the alleged subjective symptoms. *Id.*; 20 C.F.R. § 404.1529(a)–(b).  The second step requires that the ALJ evaluate the intensity and persistence of the symptoms and determine the extent to which the symptoms limit the claimant's

capacity to work. *Callaway*, 292 F. Supp. 3d at 297; 20 C.F.R. § 404.1529(c)(1).  A claimant's allegations alone do not establish disability.  *See* 20 C.F.R. § 404.1529.  While an ALJ may not reject a claimant's statements about pain "solely because they are not substantiated by objective medical evidence," the ALJ may consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." *Butler*, 353 F.3d at 1004–1005.

When evaluating Plaintiff's subjective claims regarding her symptoms, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Butler*, 353 F.3d at 1005 (quoting SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p, 2017 WL 5180304)); *Petty v. Colvin*, 204 F. Supp. 3d 196, 209 (D.D.C. 2016).  When evaluating credibility determinations, a "reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding." *Grant*, 857 F. Supp. 2d at 156; *accord Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (explaining that an ALJ's credibility determination should not be reversed unless it is "patently wrong").  If the ALJ's credibility determination and analysis "had a rational basis supported by the ALJ's consideration of the record evidence, and the evidence the ALJ cited in support of [his] credibility determination is appropriate and consistent with the medical opinions of record," the ALJ's determination stands. *Davis*, 272 F. Supp. 3d at 173.

As with most of her briefing, Plaintiff quotes extensively from other cases in this Circuit without providing the Court with much substance to address or guidance as to the ALJ's alleged errors. *See, e.g.*, Nsiah v. Saul, No. 1:19-CV-00042, 2021 WL 372784 (D.D.C. Feb. 3, 2021)

(referring to such a style of argument as "unhelpful").  Nevertheless, the Court, upon review of the entire record, will examine whether the ALJ's consideration of Plaintiff's subjective complaints was supported by substantial evidence.

The main thrust of Plaintiff's argument seems to be that the ALJ improperly failed to reckon with the limited nature of Plaintiff's ability to perform her daily activities. *See* Pl.'s Mot. at 11–14; *see also* 20 C.F.R. § 416.929(c)(3)(i) (ALJ will consider daily activities in the assessing subjective complaints).  In his opinion, the ALJ recognized that "[a]t the hearing, [Plaintiff] testified that she could perform light household chores including preparing meals, dusting, laundry duties, vacuuming, and personal grocery shopping." (AR 20).  Further, the ALJ noted that "[o]n consultative examination, [Plaintiff] reported that she showers and dresses independently, watches television, listens to the radio, reads, socializes with friends, and goes out to play bingo." (AR 20).

Were these two statements to be the only times where the ALJ addressed Plaintiff's daily activities as part of his analysis as to her subjective complaints of her symptoms, Plaintiff would have a more compelling case. *See, e.g.*, *Higgins v. Saul*, No. CV 16-27, 2019 WL 4418681 (D.D.C. Sept. 16, 2019) (finding error where the ALJ failed to acknowledge evidence of Plaintiff's limitations in daily activities).  However, the ALJ's opinion makes clear that he recognized and understood Plaintiff's alleged limitations as to her ability to perform daily activities. (AR 19, 20).  The ALJ explicitly acknowledged that, for example, Plaintiff lies in bed all day after she takes Flexeril and Tramadol, that she has difficulty concentrating because of her medication, that she can only walk one or two blocks before stopping to rest, and that she has to lie down after preparing her meals. (AR 19).  Contrary to Plaintiff's insinuations, the ALJ did not ignore or disregard her testimony as to the extent to which she can perform her daily activities.  Rather, as the ALJ

explained, he found that Plaintiff's alleged severity of symptoms was not entirely in accord with her professed daily activities, taking into account the relevant limitations. (AR 20).

Moreover, the ALJ's analysis of Plaintiff's credibility regarding her subjective complaints did not solely rely on evidence regarding her daily activities.  Instead, the ALJ considered Plaintiff's medical records, treatment records, and the opinions of medical experts and found that the record as a whole undermined some of her subjective complaints. (AR 20); *see also Callaway*, 292 F. Supp. 3d at 297–98 (finding that the ALJ did not improperly reject subjective complaints based on a lack of objective evidence where the ALJ considered the plaintiff's statements, the objective medical evidence, the opinion evidence, and the plaintiff's hearing testimony). Evidence regarding Plaintiff's daily activities was but one part of the ALJ's analysis of Plaintiff's subjective complaints.  The ALJ provided several reasons as to why "the full longitudinal record fails to support the presence of greater physical limitations." (AR 20).

First, the ALJ explained that the objective medical evidence was inconsistent with Plaintiff's subjective complaints. (AR 20); *see* 20 C.F.R. § 416.929(c)(2) (stating that objective evidence is "a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work"); SSR 16-3p, 2016 WL 1119029, at *5 ("[I]nconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").  The ALJ noted that record evidence demonstrates that Plaintiff "retains full strength, intact sensations, and normal physiological gait," and no signs of motor weakness. (AR 20).  Next, the ALJ explained that the consultative examiner found that Plaintiff demonstrated 3/5 grip strength bilaterally but displayed intact finger and hand dexterity and could otherwise zip, button, and tie without difficulty. (AR 20).  Further, the ALJ noted that

imaging from October 2018 of Plaintiff's lumbar spine "failed to reveal any significant changes" from prior examinations. (AR 20)

The Court finds that the ALJ provided a sufficient "logical bridge" linking the record evidence to his evaluation of Plaintiff's subjective complaints to satisfy the substantial evidence requirement.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's [14] Motion for Judgment of Reversal is **DENIED** and Defendant's [17] Motion for Judgment of Affirmance is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

Dated: March 10, 2022                                   /s/

                                                    **COLLEEN KOLLAR-KOTELLY**
                                                    United States District Judge